UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Universal Hospital Services, Inc., Civ. File No. 01-2072 (PAM/JGL)

Plaintiff,

v.

**MEMORANDUM AND ORDER**

Joseph Hennessy,

Defendant.

---

This matter is before the Court on Plaintiff's Motion for a Temporary Restraining Order ("TRO"). For the reasons that follow, the Motion is granted.

**BACKGROUND**

Defendant Joseph Hennessy was employed by Plaintiff Universal Hospital Services, Inc. ("UHS") as a District Manager in UHS' Boston office. As a District Manager, Hennessy was responsible for servicing existing customers and soliciting prospective customers for UHS' movable medical equipment business. Near the inception of Hennessy's employment in 1998, he signed a Non-Competition and Non-Disclosure Agreement (the "Agreement"). (Thieding Aff. Ex. A.) The Agreement provided that, for a period of 12 months following the termination of Hennessy's employment with UHS, and within 100 miles of Boston, Hennessy would not: (1) "compete with UHS in the rental of medical equipment similar to or competitive with those offered by UHS" (Id. ¶ 4.2); (2) "engage in or attempt to engage in any business with any Customer or Client, in competition with UHS, solicit any business

FILED JAN 23 2002
RICHARD D. SLETTEN, CLERK
JUDGMENT ENTD________
DEPUTY CLERK________

from any person, firm, partnership, associate, corporation which is a customer or client of UHS for the purpose of engaging in business in competition with UHS" (Id. ¶ 4.4); or (3) "employ, seek to employ, solicit the employment of, or entice or induce to terminate employment with UHS, any person who is an employee of the Employer, or otherwise take any action detrimental to the relationships between UHS and its present and future employees" (Id. ¶ 4.5). The Agreement also contained a non-disclosure provision that is not limited in time or geographic scope. That provision prohibited Hennessy from using or disclosing "to any person, entity, firm or corporation other than UHS, any confidential information, whether said information may be in tangible or intangible form, or in the Employee's memory and whether for the Employee's own benefit or for the benefit of another." (Id. ¶ 4.3.) The Agreement defined confidential information in some detail. (Id. ¶ 1.3.)

In April 1998, Hennessy was given a stock option agreement with UHS. In connection with that agreement, he signed a Confidentiality/Non-Disclosure Agreement. (Blomfelt Aff. Ex. A.) This Agreement did not differ from the previous Agreement in any material respect, and contained similar restrictions on competitive conduct and disclosure of confidential information contained in the previous Agreement. The existence of this second Agreement came to light immediately before the hearing on the Motion for TRO. Hennessy contends that the Court should disregard the second Agreement because UHS' Complaint mentions only the first Agreement. To ignore the second Agreement, however, merely

because UHS has not had the time to amend its Complaint to include claims for breaches of that Agreement exalts form over substance. The Court will consider the second Agreement when evaluating UHS' request for a TRO.

Hennessy quit his job with UHS in October 2001. Immediately after Hennessy left UHS, he began to work for Freedom Medical ("Freedom"), a direct competitor of UHS. After Hennessy left UHS, a UHS employee found a letter from Hennessy to the president of Freedom, in which Hennessy allegedly disclosed UHS' confidential customer information. (Dolliver Aff. Ex. A.) According to UHS, Hennessy apparently inadvertently left a copy of the letter in the files that he returned to UHS at the conclusion of his employment. Hennessy denies that he wrote or sent the letter, intimating that the letter is a fabrication on the part of UHS. In any event, the letter states that "[i]t is my sincere desire to seek employment with Freedom Medical." (Id. at 3.) The letter acknowledged, however, that Hennessy's covenant not to compete with UHS would pose a "major hurdle." (Id.)

After learning that Hennessy had taken a job with Freedom, UHS discovered that Hennessy had solicited at least two UHS customers in the Boston area. UHS also claims that Hennessy enticed another UHS employee, Scott Moore, to join him at Freedom, and that Hennessy has refused to return UHS' confidential information. UHS instituted this lawsuit, claiming that Hennessy's conduct is in breach of the Agreement. UHS now seeks a TRO to force Hennessy to abide by the terms of the Agreement.

Hennessy contends that UHS asked Hennessy to do activities that he believed were illegal and unethical, including falsifying client's bills. In his Answer, he claims he was constructively discharged for his complaints about these activities in violation of the Minnesota Whistleblower Statute, Minn. Stat. § 181.932. He asserts that the TRO should be denied because he signed the Agreement after he began working at UHS, so that no consideration was provided for the Agreement. He seeks a declaratory judgment that the Agreement is void for lack of consideration. He also argues that he played no role in Scott Moore's decision to leave UHS for Freedom. Finally, he contends that there is very little "confidential" information in the medical equipment rental business, and that, in any event, he has not disclosed any of UHS' confidential or proprietary information.

## DISCUSSION

### A. Injunctive Relief

A TRO may be granted only if the moving party can demonstrate: (1) a likelihood of success on the merits; (2) that the balance of harms favors the movant; (3) that the public interest favors the movant; and (4) that the movant will suffer irreparable harm absent the restraining order. Dataphase Sys., Inc. v. C L Sys., Inc., 640 F.2d 109, 113 (8th Cir. 1981). Injunctive relief is considered to be a "drastic and extraordinary remedy that is not to be routinely granted." Intel Corp. v. ULSI Sys. Tech., Inc., 995 F.2d 1566, 1568 (Fed. Cir. 1993).

Where a former employee violates a valid covenant not to compete, the Court may infer irreparable harm to the employer. See Alside, Inc. v. Larson, 220 N.W.2d 274, 278 (Minn. 1974); Medtronic, Inc. v. Gibbons, 527 F. Supp. 1085, 1091 (D. Minn. 1981). Moreover, irreparable harm is often inferred from the threatened misappropriation of trade secrets or other confidential information. See Minn. Stat. § 325C.02. Thus, if either Agreement is valid, then UHS has proved both a likelihood of success and that it is suffering irreparable harm from Hennessy's breach of the restrictive covenants.

Minnesota disfavors noncompetition agreements as restraints on trade. Nat'l Recruiters, Inc. v. Cashman, 323 N.W.2d 736, 740 (Minn. 1982). To be valid, the agreement must be reasonable in scope, Overholt Crop Ins. Serv. Co. v. Bredeson, 437 N.W.2d 698, 703-04 (Minn. Ct. App. 1989) (discussing what constitutes reasonableness in restrictive covenants), and must be supported by sufficient consideration. A restrictive covenant in an employment agreement entered into at the inception of the employment relationship does not require independent consideration. Cashman, 323 N.W.2d at 740. If the agreement is not entered into at the beginning of employment, however, it must be supported by independent consideration. Id. Continued employment may constitute independent consideration "if the agreement is bargained for and provides the employee with 'real advantages'." Midwest Sports Mktg., Inc. v. Hillerich & Bradsby of Canada, Ltd., 552 N.W.2d 254, 265 (Minn. Ct. App. 1996) (citing Freeman v. Duluth Clinic, 334 N.W.2d 626, 630 (Minn. 1983)).

Hennessy argues that the Agreements are not reasonable in scope because they are not necessary for the protection of the business of UHS. (Def.'s Opp'n Mem. at 11.) His contention that there is no confidential information in the movable medical equipment business to be protected by restrictive covenants strains credulity. Moreover, the Agreements are not overly broad: both Agreements are limited to one year and apply only within a 100-mile radius of Boston. Thus, the restrictive covenants in the Agreements are reasonable in scope.

However, the first Agreement is not supported by sufficient consideration. According to Hennessy, he was not given the Agreement until 15 days after he accepted the job with UHS, and he did not sign the Agreement until almost a month after that. (Thieding Aff. ¶ 7 and Ex. A.) Thus, the Agreement was not entered into at the beginning of Hennessy's employment, and must be supported by independent consideration to be valid. UHS has not shown that Hennessy's continued employment at UHS constituted such independent consideration, and thus the first Agreement fails for lack of consideration.

Unlike the first Agreement, the second Agreement is supported by sufficient consideration. Hennessy contends that the second Agreement lacks consideration because there is no proof that Hennessy actually received the stock options at issue. Whether Hennessy actually received stock options, however, is of no moment. By signing the second Agreement, Hennessy was made eligible for a benefit he could not have received without signing the Agreement. Thus, the second Agreement is valid.

Moreover, at this very preliminary stage of the litigation, UHS has met its burden to show that Hennessy has violated the terms of that Agreement. Thus, UHS has shown a likelihood of success on the merits. Because UHS has established that Hennessy is breaching a valid noncompetition agreement, it has also proved that it will suffer irreparable harm absent the TRO.

The balance of harms at this stage tips in favor of UHS. Hennessy alleges that he will be unable to make a living should the TRO issue. It is difficult to believe that Freedom cannot find another territory for Hennessy to cover during the short pendency of a Restraining Order. UHS has established that it will suffer irreparable harm, and this harm outweighs the harm Hennessy may incur.

Finally, public policy favors the enforcement of valid contracts and the protection of business interests. Thus, this factor weighs in favor of UHS.

**B. Jurisdiction**

Hennessy claims that the Court lacks subject matter jurisdiction because the amount in controversy is less than $75,000. UHS avers that the harm it may suffer is greater than $75,000. It may become clear as the litigation progresses that the amount in controversy does not meet the jurisdictional minimum. However, at this preliminary stage of the case, the Court concludes that the amount in controversy is greater than $75,000.

Finally, Hennessy argues that the Court lacks personal jurisdiction over him. He has no contacts with Minnesota, and has visited here only three times. However, both the first

and second Agreements provide that Hennessy consents to the jurisdiction of the courts of Minnesota. For the purposes of the TRO, the Court will take Hennessy's consent as sufficient to establish the Court's jurisdiction over him. Should Hennessy wish to raise the personal jurisdiction issue in more detail in later briefing, he may do so.

**CONCLUSION**

For the foregoing reasons, and upon all of the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

1. Plaintiff's Motion for a Temporary Restraining Order (Clerk Doc. No. 6) is **GRANTED** as follows:

    a. Pending the Court's decision on Plaintiff's Motion for a Preliminary Injunction, Defendant is hereby restrained from violating the terms of the Confidentiality/Non-Disclosure Agreement that he signed in April 1998. Specifically, Defendant must:

        i. promptly return to UHS any and all documents, records, magnetically stored information and other items in his possession which disclose, describe, or embody Confidential Information, as defined by the Agreement; and

        ii. not engage in any activity that competes with UHS business within a 100-mile radius of Boston, Massachusetts, as such

activities are defined in paragraphs 3(b) through (f) of the April 1998 Agreement;

2. Pursuant to Fed. R. Civ. P. 65, within ten days from the date of this Order, Plaintiff shall post a bond in the amount of $10,000 to secure this Temporary Restraining Order. In lieu of a bond, Plaintiff may post cash or its equivalent with the Clerk of Court.

Dated: Jany 23, 2002

Paul A. Magnuson
United States District Court Judge